**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

RAYMOND ZIELINSKI,
NATHALIE ZIELINSKI,
RAYMOND HELD,
DOROTHY HELD,
ROBERT BALLENGER,
VIOLA BALLENGER,
PETER CIURRO,
and LAVERNE CIURRO,
**individually and as a**
**class of persons similarly situated,**

              **Plaintiffs,**

   v.                                                Case No. 04-C-0385

**PABST BREWING COMPANY, INC.,**
**a Delaware Corporation,**

              **Defendant.**

## DECISION AND ORDER

The Plaintiffs, who are retirees of the Schlitz Brewing Company ("retirees"), bring this class action suit against Pabst Brewing Company ("Pabst"), alleging that Pabst violated provisions of the Labor-Management Relations Act ("LMRA") and the Employee Retirement Income Security Act ("ERISA") by making changes to the retirees' health benefits plan.[1]

---

[1] Class certification was granted in the Court's order of November 30, 2005. The Court defined the class as those persons "who as of the 31 December 2003 were receiving health benefits from Pabst

1

Pending before the Court are the parties' cross-motions for summary judgment. Because the retirees' health benefits never vested, the Court must deny their motion for summary judgment, grant Pabst's motion for summary judgment, and close the case.[2]

## BACKGROUND

In 1981, the Schlitz Brewing Company ("Schlitz") closed its Milwaukee, Wisconsin brewery. (Defendant's Proposed Finding of Fact ("DPFF" ¶ 1.)) When it closed its Milwaukee plant, Schlitz reached agreements with its retired workers to continue to provide certain health care benefits. While Schlitz was initially responsible for administering the retirees' health care plan, Schlitz was later bought by Stroh Brewing Company ("Stroh"), which in turn, was bought by Pabst in 1999. (DPFF ¶¶ 3-4.) When Pabst acquired the assets and liabilities of Stroh, it assumed the role of Plan Administrator for the health plan covering the retirees. (Plaintiff's Proposed Finding of Fact ("PPFF" ¶ 1.))

The health plan that Pabst inherited is a series of related documents describing the benefits Schlitz agreed to provide its retirees upon the closing of its Milwaukee brewery. That series begins with the two 1981 Schlitz shutdown agreements: one pertaining to the production employees, and the other pertaining to the merchandising men and servicemen.

---

pursuant to either the 6 November 1981 Schlitz/Local 9 closing agreement covering production employees or the 23 December 1981 Schlitz/Local 9 closing agreement covering the merchandising men and servicemen." *Zielinski v. Pabst*, 2005 WL 3240590, at *1 (E.D. Wis. November 30, 2005). Thus, when the Court refers to the "retirees" in this opinion, it is referring to the entire class as defined in its November 30, 2005 order.

[2] Pabst brought a motion to adjourn the trial date and the pre-trial conference. Given the Court's decision, that motion is moot.

2

The terms of both of the agreements are substantially similar for purposes of this litigation.

The shutdown agreement pertaining to the production employees was executed on November 6, 1981 ("November 1981 Shutdown Agreement"), and it provides that "[Schlitz] shall continue to provide the health and welfare benefits for retirees described in Article VII of the terminated labor agreement dated June 1, 1979, to June 1, 1980." (PFFF ¶ 13.) Similarly, the shutdown agreement pertaining to the merchandising men and servicemen, which was executed on December 23, 1981 ("December 1981 Shutdown Agreement"), states that "[Schlitz] shall continue to provide health and welfare benefits for retirees described in Article VI of the terminated labor agreement dated January 1, 1980 to December 31, 1981." (First Am. Comp. Ex. B at 1.) In other words, by the terms of these agreements, Schlitz agreed to "continue to provide" health benefits at the same levels that were in effect for the retirees at that time.

Both Article VII of the terminated labor agreement to which the November 1981 Shutdown Agreement referred, and Article VI of the terminated labor agreement to which the December 1981 Shutdown Agreement referred, both provide that retirees receive "Blue Cross and Blue Shield Medicare Extended coverage." (PFFF ¶¶ 15, 17.) Both agreements also provide that the retirees are entitled to "the Blue Cross-Blue Shield Prescription Drug Program ($2.00 deductible per prescription) as described in Bulletin S462a." (*Id.*)

Initially, when considering the first summary judgment motions filed by the parties, the Court noted that Bulletin S462a was missing from the record. *See Zielinski v. Pabst*, 360

3

F. Supp.2d 908, 925-26 (E.D. Wis. 2005). After conducting further discovery, the parties are still unable to find Bulletin S462a, but they did find a tri-fold pamphlet with the nomenclature S462a on it. (DPFF ¶ 32.) This pamphlet is a summary of Bulletin S462a and describes some aspects of the Blue Cross-Blue Shield Prescription Drug Program. (Aff. Olson ¶ 6, Ex. C.) Specifically, it states that the prescription drug program "provides liberal 'no maximum' coverage for prescription bills," (*Id.*) that the drug program has a "moderate" deductible, and that "[s]tatements are subject to the coverage, exclusions, amendments and other provisions of the contract and subscription fees which are subject to change." (DPFF ¶ 33.)[3]

On January 1, 2004, Pabst made changes to the retirees' health benefits in six material respects. First, while Pabst kept the prescription drug deductible for generic drugs at $2.00, it changed the deductible for "preferred brands" to $35.00 and "non-preferred brands" to $50.00. (PPFF ¶ 2.) Second, Pabst decreased the supply of prescription drugs from a 34 day supply to a 30 day supply. (PPFF ¶ 3.) Third, Pabst instituted a new $3000 annual maximum

---

[3] The parties dispute whether the 1978 Schlitz Employee Benefits book ("1978 Benefits book") accurately describes the health benefits in effect when the shutdown occurred in 1981. The Court found, in its order of February 25, 2005, that the 1978 Benefits book was not incorporated into the 1981 shutdown agreements. *See Zielinski v. Pabst*, 360 F. Supp.2d 908, 916-917 (E.D. Wis. 2005). The Court finds no reason to change its original ruling in this regard. Bulletin S462a was the only document specifically incorporated into the 1981 shutdown agreements, and the pamphlet which summarizes Bulletin S462a makes no reference to the 1978 Benefits book. Thus, there is nothing that connects the 1978 Benefits book to the 1981 shutdown agreements.

Even if the Court were to incorporate the 1978 Benefits book into the shutdown agreements, the result of this litigation would be the same. The 1978 Benefits book clearly contemplates the possibility of future revisions: "As your benefit plans are amended or modified, the appropriate sections will be revised and clearly identified new pages will be distributed to you." (Aff. Stevens Ex. A).

4

benefit for certain prescription drugs. (PPFF ¶ 4.) Fourth, Pabst began to apply prescription drug charges to the lifetime maximum. (PPFF ¶ 6.)[4] Fifth, Pabst also began considering prescription drug charges as medical care for purposes of determining whether participants could restore a portion of their $20,000 lifetime maximum. (PPFF ¶ 5.) And finally, Pabst decided to apply expenses paid under the Supplemental-Medicare Program to the lifetime maximum. (PPFF ¶ 9.)[5]

In response to these changes, the retirees sued under LMRA and ERISA claiming that the health benefits it received in 1981 are inalterable. Both the retirees' and Pabst's motions for summary judgment are now before the Court.

**STANDARD OF REVIEW**

Summary judgment is proper when, construing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Rauen v. United States Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 895 (7th Cir. 2003). Summary judgment is

---

[4] Pabst alleges that it always applied the prescription drug benefits toward the lifetime maximum, and claims that this particular policy is not a change to the retirees' health benefits plan. However, the pamphlet summarizing Bulletin S462a and the Blue Cross-Blue Shield Prescription Drug Program explicitly states that it "provides liberal '*no maximum*' coverage for prescription bills." (Aff. Olson ¶ 6, Ex. C.) (emphasis added.) Pabst's subsequent decision to apply prescription benefits to the lifetime maximum, therefore, is a change to the retirees' plan.

[5] The retirees list two additional changes. First, the retirees allege that Pabst now discontinues a retirees' prescription drug benefits when a retiree reaches the lifetime maximum. This change, though, is part of the more general, new policy of applying prescription drugs to the retirees' $20,000 lifetime maximum. Second, the retirees allege that Pabst discontinued medical insurance for a retiree's spouse when a retiree reaches his $20,000 maximum. Pabst later reversed this change, though, reinstated the terminated spouses' benefits, and refunded monies expended by those spouses.

5

particularly appropriate in cases involving contract interpretation. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564-65 (7th Cir. 1995).

## DISCUSSION

Under ERISA, employee benefit plans are either classified as pension plans or welfare benefit plans. *See* 29 U.S.C. § 1002(1), 1002(2)(A). Pension plans are those that provide retirement income to employees. 29 U.S.C. § 1002(2)(A). Welfare benefit plans, on the other hand, are those that provide "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment. . . ." 29 U.S.C. § 1002(1). There is no dispute that the health benefit plan at issue in the instant case is a welfare benefit plan as defined by ERISA.

Unlike pension plans, which are subject to strict vesting requirements, welfare benefits are not automatically vested, but vest only if the plan contract so provides. 29 U.S.C. § 1051(1). *See also Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 79 (1995). By rejecting the automatic vesting of welfare plans, "Congress recognized the need for flexibility with respect to an employer's right to change medical plans." *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 138 (3d Cir. 1999). The Second Circuit explained the purpose for the more flexible approach to welfare plans as opposed to the strict vesting requirements of pension plans when it observed:

> Automatic vesting was rejected because the costs of such plans are subject to fluctuating and unpredictable variables. Actuarial decisions concerning

6

> fixed annuities are based on fairly stable data, and vesting is appropriate. In contrast, medical insurance must take account of inflation, changes in medical practice and technology, and increases in the cost of treatment independent of inflation. These unstable variables prevent accurate prediction of future needs and costs.
>
> *Moore v. Metropolitan Life Ins. Co.*, 856 F.2d 488, 492 (2d Cir. 1988).

Because welfare plans do not automatically vest, employers are "generally free . . . for any reason at any time, to adopt, modify or terminate welfare plans." *Curtiss-Wright*, 514 U.S. at 78.

Employers, though, may contractually cede its freedom to unilaterally modify or terminate welfare benefits by electing to enter into a private contract with its employees guaranteeing lifetime vesting. *See Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005). Nonetheless, a court must presume that welfare benefits have not vested, and a contractual provision that purports to vest welfare benefits must be found in "clear and express language" in the plan documents. *Id.* at 784 (citation omitted). While an ambiguity in the contract allows a court to consider extrinsic evidence, "silence" about the duration of benefits is not construed as an ambiguity, but rather "indicates that welfare benefits are not vested." *Vallone v. CNA Financial Corp.*, 375 F.3d 623, 632 (7th Cir. 2004).

In the instant case, the shutdown agreements are silent on the question of whether the health benefit plan vested. Both the November 1981 Shutdown Agreement and the December 1981 Shutdown Agreement only state that the plan administrator "shall continue to provide" health benefits at the same levels that were in effect for the retirees

7

at that time. Language in a plan document asserting that welfare benefits "shall continue" does not create an ambiguity, *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 816 (7th Cir. 1992), nor does it shed any light whatsoever on the question of vesting. Indeed, the shutdown agreements say nothing at all about whether the health benefits provided in 1981 must remain inalterable for the life of the retirees. This silence "indicates that the welfare benefits are not vested." *Vallone*, 375 F.3d at 632. Accordingly, Pabst was free to make changes to the health care plan of the retirees, and as such, must be granted summary judgment in its favor.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**:

Pabst's Motion for Summary Judgment (Docket No. 97) is **GRANTED.**

The Retirees' Motion for Partial Summary Judgment and Permanent Injunction (Docket No. 102) is **DENIED.**

Pabst's Rule 7.4 Non-Dispositive Motion to Adjourn the Pretrial Conference and Trial (Docket No. 130) is **DENIED** as moot.

The clerk is directed to enter judgment and close this case accordingly.

Dated at Milwaukee, Wisconsin this 13th day of December, 2005.

                                            **BY THE COURT**

                                            s/ Rudolph T. Randa
                                            **Hon. Rudolph T. Randa**
                                            **Chief Judge**